UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

In re:

    J. Marzine Wood and
    Kristina F. Wood,                         Case No:      08-33538-dof
                                                    Ch. 13

    Debtors.
_____/

Donald Cole and Rebecca Cole,

    Plaintiffs,


v.                                                                Adv. Pro. No. 08-03202


J. Marzine Wood and
Kristina F. Wood,

    Defendants.
_____/

Opinion Regarding Plaintiffs' Complaint for Nondischargeability
of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A)

In this adversary proceeding, the Plaintiffs seek a non-dischargeability of debt determination on a debt the Defendants allegedly owed to them based on actual fraud under 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code. The Plaintiffs purchased a home from the Defendants. The Plaintiffs actual fraud claim is premised on the Defendants' alleged false representations and non-disclosures about the extensive foundational problems that existed with the home.

For the reasons explained in this opinion, the Court determines that the Plaintiffs did not prove by a preponderance of the evidence that the debt alleged to be owed by the Defendants to

the Plaintiffs is excepted under 11 U.S.C. § 523(a)(2)(A) from the Defendants' discharge.

## Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(a), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## Procedural History

On August 29, 2008, J. Marzine Wood and Kristina F. Wood (the "Defendants") filed their joint voluntary petition under Chapter 13 of the Bankruptcy Code. On November 21, 2008, Donald Cole and Rebecca Cole (the "Plaintiffs")[1], initiated this adversary proceeding against the Defendants. On December 17, 2008, the Defendants filed an answer to the Plaintiffs' complaint. In their answer, the Defendants denied the majority of the allegations pled against them.

The Court conducted a trial in this proceeding over two days: beginning on June 28, 2010, and concluding on June 29, 2010. On the second day of trial, at the conclusion of the Plaintiffs' case in chief, the Defendants moved for a directed verdict of the Plaintiffs' cause of actions premised on 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(6). In opposing the Defendants' motion, the Plaintiffs withdrew their Section 523(a)(6) and (a)(2)(B) actions. The Defendants further represented to the Court that they were proceeding only on their Section 523(a)(2)(A) action premised on actual fraud. In light of the Defendants' representations, this proceeding was narrowed to only the Plaintiffs' action under Section 523(a)(2)(A). With consideration of the applicable standards and the record before it,

---

1. During the pendency of this proceeding, Plaintiff, Rebecca Cole, died. Despite her death, the Court uses the reference "Plaintiffs" to avoid any confusion with the circumstances in this case.

the Court denied the Defendant's motion for a directed verdict on the Plaintiffs' Section 523(a)(2)(A) claim. After this ruling, the trial continued with the Defendants' case in chief. At its conclusion, the proofs were closed.

During the trial, the Court heard the testimony of five witnesses and received into evidence the Plaintiffs' Exhibits 1 through 2, 5 through 6, 10, and 14 through 21. Exhibits 3 and 7 were admitted with limitations. At the conclusion of the trial, due to the numerous exhibits admitted in the record, the parties agreed to file post-trial briefs in lieu of closing arguments. The parties timely filed these briefs based on the schedule established by the Court.

This opinion constitutes the Court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052. The findings of fact to be stated by the Court reflect its weighing of evidence, including consideration of the witnesses. "In doing so, the court considered each witness's demeanor, the substance of the testimony and the context in which the statements were made recognizing that a transcript does not convey tone, attitude, body language, or nuance of expression." *In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). The Court considered the testimony of all the witnesses, as well as all exhibits admitted into evidence, even if not specifically mentioned in this decision.

Facts

Prior to his marriage, in April 1998, Defendant, J. Marzine Wood purchased a lot at 6457 Oriole Drive, Genesee Township, Michigan (the "Property"). Mr. Wood, along with assistance from his then fiancé, now wife, and other individuals, built a home on the Property. The Defendants were married on June 19, 1999.

Sometime in the summer to early fall of 2000, the Defendants began to experience

problems with the southeast wall of the Property. The Defendants contacted Mr. Robert Showler, of AnchorTech Foundation, Inc., as well as B-Dry System of Michigan. Mr. Showler testified that his business AnchorTech had been involved in hundreds of "residential repairs remediations where foundations were settling or sinking." He further testified that AnchorTech has installed helical piers when soil is bad to allow a new home, structure, whether residential or commercial, to be built. Mr. Showler further testified that he has been engaged in this type of work for 30 years.

Mr. Showler testified that during his initial investigation of the Property, he looked over "primarily the southeast corner of the basement and foundation, around the front porch area [and] that was where the problem was . . . I was looking at where the water tank and water pump and stuff are housed. Their well, their sump pump, well control tank were in that room." He further testified that: "The front porch is on the southeast corner of the house and the porch was settling to the south and the walls were cracked. And a little bit of the wall to the west of the room was cracked best I can remember it." Mr. Showler explained that he proposed to repair the problem by "installing helical piers around the immediate area where the porch . . . was tipping . . . to stop it from settling." He explained that,

> a helical pier is [a] steel shaft . . . [that has] sections. The first section has what are called helicals which is a round steel disk which you called an auger, a round steel disk that is like cut from the middle out and then twisted so that is has like – it's almost like a wood screw that you're putting into the earth. And then there are extensions added to that so as it's advanced into the soil you can, you know, continue deeper as needed. That's – that's a helical pier.

Mr. Showler further testified that once a helical pier is installed, it is then fastened to the structure depending on the type of structure the work is being performed on. He admitted that the ultimate objective is to stabilize the foundation where the soil is unsuitable.

4

Mr. Showler testified that the Defendants hired his company. Work began at the Property after Mr. Showler received a signed copy of his proposal and a deposit.

While performing excavation work at the Property, Mr. Showler testified that the soil conditions "changed dramatically." He explained that "[w]hen we got to the bottom it was real soft, the term would be marrow or clay or silt", . . . which is "like quicksand." Mr. Showler testified that he immediately stopped work and informed the Defendants of his discovery. He further explained that he suggested to the Defendants that they retain an engineer to help them figure out how to proceed. Mr. Showler testified that he recommended the Defendants contact Sheppard Engineering.

According to Mr. Showler, Mr. Marty Klein, a representative from Sheppard Engineering, visited the Property and proposed a correction to the problem that included the removal of walls and new walls being put in, along with the removal of parts of the floor. Mr. Showler testified that he informed the Defendants that AnchorTech could not complete the repair as originally proposed due to the extent of the correction recommended by Sheppard Engineering.

At some point, based on discussions between Mr. Showler and Mr. Klein, Calculus Group, LLC ("Calculus") became involved in the repair work to the Property. According to Mr. Showler's undisputed testimony, Calculus acted as the general contractor and was in charge of the entire job. Mr. Showler further testified that he was the subcontractor with a limited role that involved only the installation of helical piers according to the repair plan provided to him by Calculus. Mr. Showler testified that based on plans, specifications, and calculations provided by Calculus, AnchorTech installed a total of eleven helical piers at the Property during two different

time periods. He explained that while Calculus initially recommended the installation of four helical piers, another seven helical piers were required to be installed during the repair of the southeast wall of the Property. Calculus completed the work at Property in the fall of 2000. After this repair, the Defendants testified that they did not experience any further problems with the Property.

On November 3, 2000, Mr. Wood, individually, commenced a lawsuit against Carl Liesen, Genesee Township Building Department, and Larry Crame, building inspector, in the Genesee Circuit Court, State of Michigan. On March 31, 2001, a first amended complaint was filed in the state court lawsuit. The complaint was amended to add Ronald Desrochers as a defendant. Under this lawsuit, Mr. Wood sought to recover the losses he incurred to restore the southeast portion of the basement wall that fell at the Property. The Defendants eventually received a modest settlement and the lawsuit was dismissed on January 16, 2003.

In 2002, the Defendants put the Property up for sale because of their need for a larger home to accommodate their family of five. On July 16, 2002, the Defendants completed and signed a seller's disclosure statement. On page two of their disclosure statement, under a heading entitled "Other Items: Are you aware of any of the following:" the following question appears – "5. Settling, flooding, drainage, structural, or grading problems?" Next to the question is an area that contains three choices to select: unknown, yes, or no. In response, the Defendants did not check a box or insert any explanation in this area. Instead, the Defendants attached a handwritten statement to their disclosure statement, which contains the following language:

> Piers put under footings in front of house due to soil content. Piers were driven down to solid granite and clamped to foundation wall for stabilized support. Piers are warrantied for the life of the house through AnchorTech.

Sometime in August or September 2002, the Plaintiffs visited the Property during an open house event. On their second visit to the Property, the Plaintiffs decided to purchase the Property. In the presence of the Defendants' realtor, the Plaintiffs reviewed the Defendants' disclosure statement and then prepared their offer to purchase. The Plaintiffs received a copy of the Defendants' disclosure statement. On September 25, 2002, the Defendants accepted the Plaintiffs' offer.

Paragraph 6, entitled "Condition of Property" of the executed Purchase Agreement, provided, in part:

> Purchaser acknowledges that he/she is purchasing an existing structure about which Broker and its salespeople have made no representations or warranties of any kid. Purchaser acknowledges that Broker advised him/her to have the property privately inspected by a licensed home inspection company at Purchaser's expense[.]

Paragraph 11 of the Purchase Agreement addressed property inspections, stating in part:

> Purchaser shall have the option for _____ calendar days after acceptance of this agreement to have the property inspected and tested by licensed inspectors(s) of the Purchaser's choice and at the Purchaser's expense. The inspection(s) and test(s) may include, but are not limited to, building structure, mechanical systems, environmental items, water, septic, pest, radon and mold. If not satisfied with the condition of the property, the Purchaser shall notify the Seller and/or Seller's agent <u>in writing with a copy of the Inspection report(s)</u> specifying any defective or unsatisfactory condition(s) no later than 3 calendar days after each test. If no written notice of a defective condition is received or no inspection or test is held within the time alloted, the right to inspect shall be deemed waived and the Purchaser shall accept the property "as is". In the event of a timely and valid notice of substantial defect or unsatisfactory test result, the Purchaser shall have the option to request Seller to correct the defect up to applicable building code or health and environmental standards or terminate this agreement with full refund of the Earnest Money Deposit to the Purchaser. In the event the Purchaser requests a correction of the defect, Seller has [the] option to correct the defect as outlined above or return Purchaser's Earnest Money Deposit in full termination of this agreement.

Another provision of the Purchase Agreement states:

7

08-03202-dof    Doc 33    Filed 03/31/11    Entered 03/31/11 15:37:28    Page 7 of 19

> TIME IS OF THE ESSENCE. THIS IS A LEGALLY BINDING CONTRACT AND ALL PARTIES ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED TO HAVE AN ATTORNEY REVIEW THE TRANSACTION ON THEIR BEHALF. PURCHASER HEREBY ACKNOWLEDGES THAT THEY HAVE BEEN ADVISED TO HAVE A CONTRACTOR(S) INSPECTION IF THERE ARE ANY QUESTIONS RELATING TO THE CONDITION OF THE PROPERTY. PURCHASER ALSO ACKNOWLEDGES THAT BROKER HAS RECOMMENDED THAT A SURVEY BE OBTAINED.

The Plaintiffs did not have the Property inspected. The closing on the Property took place on October 28, 2002. The Plaintiffs moved into the Property two days later.

According to Mr. Cole, after a couple of weeks at the Property, he noticed that he did not hear the sump pump working. He further testified that when he lifted up the lid to the sump pump, he "was quite shocked to see about a two foot gap between the bottom of the floor and where the actual soil was down there. The sump crock and everything had sunk right down in an area probably about 15 feet in diameter. There was just a big void under the floor." Mr. Cole further testified that when the Defendants' realtor stopped by the Property to drop off an item, he asked her if she was aware of the problem, and she told him that she was not. Mr. Cole further testified that he then learned that the sump pump did not work. He testified that he fixed the sump pump by replacing its motor.

Mr. Cole also testified that in the spring of 2003, he noticed that when the sump pump was discharging water in the ditch, "it was also discharging the silt." He further stated that the silt would build up so much in the ditch that he would have to dig it out and dispose of it in the back of the Property. He also stated that he began to see "little cracks and seepage in the wall." He said this process continued throughout the summer of 2003. Then, one night during the spring of 2004, he heard "a big crack." When he went downstairs, he saw "that part of the basement wall had split right apart."

8

Mr. Cole testified that he contacted Mr. Showler of AnchorTech to inspect the problems he noticed in the basement and with the sump pump. Mr. Showler testified that he observed the "big crater like under the floor" in the basement and was surprised that "the floor was still staying." He further testified that he noticed that the "sump pump had been pumping . . . silt out into the ditch . . . by the road." He testified that he also observed at least two or three spots where the silt:

> had seeped up through the wall or – through the wall or up from underneath onto the floor and the walls were very dark as though the – it appeared to me as though the drain tile had probably filled with this silt and the water pressure was building up around the perimeter.
>
> There was – . . . numerous cracks in the walls. There was . . . the sump pump was pumping very heavily. You know, the water was still coming in through these voids that were under the floor.
>
> The water table . . . was right up against the bottom of the floor there. I mean it was – it was very – there's a lot of movement of water into the sump pump and the pump was pumping consistently. Those were my main observations. I mean it was very obvious that there was a serious problem there.

Based on Mr. Showler's recommendation, Mr. Cole testified that he contacted Dan Hanson of Hanson Engineering to evaluate the problems. He further stated that shortly thereafter the Plaintiffs retained both Hanson Engineering and AnchorTech to fix the problems with the southwest and the west wall of the basement. Mr. Showler further testified that the repair work performed by him for the Plaintiffs in 2004 and 2005 involved raising the house about four feet from its original location, removal of the foundation, and then the replacement of the foundation.

Mr. Cole testified that the total combined costs for both AnchorTech and Hanson Engineering was $113,446.81. Mr. Cole testified that they had to leave the Property for four months while it was being repaired. In addition, along with the repair costs, Mr. Cole testified

9

that they incurred the following damages: $1,500 for rental housing; $400 for storage; $2,800 for meals; $4,000 for replacement of damaged furniture; $16,000 in an early withdrawal penalty from Mr. Cole's GM profit sharing plan; $400 to clean the duct work; $200 painting material; $18,000 in losses from the sale of a truck, a truck camper, and a motorcycle; and $3,000 in interest on a home equity loan.

Mr. Cole testified that the statements contained in the Defendants' disclosure statement were critical factors in the decision to buy the Property. He further testified that if he had known about the Defendants' state court lawsuit and any concerns expressed or problems discovered about the stability of the foundation at the Property, he would not have purchased the Property.

Mr. Todd Dailey, a structural engineer for 28 years, testified on behalf of the Defendants. He testified that he has Bachelors of Science Degree from Michigan Technological University. He further testified that he is a registered engineer in the States of Michigan and Ohio. He explained that he has experience in conducting "forensic examinations of residential and commercial structures that have some sort of problem."

Mr. Dailey testified that he reached two conclusions about the work performed at the Property in 2000 based on his review of documents from Sheppard Engineering and Hanson Engineering. First, he testified that the "investigation and repairs prepared by Sheppard Engineering, . . . seem appropriate[.] And, I also believe that at that time there were no other problems exhibiting themselves in the home." Second, he further testified that "just because problems developed with the south wall that based on the evidence available at the time, it's not reasonable to have expected or predicted that there would be the problems developing in . . . other areas of the house." Mr. Dailey further testified that he concluded the problem confronting Sheppard Engineering was that "some of the footings and some of the floor slab was on

unsuitable soils. They [were] too compressable." He explained that to verify whether the silt lied beneath the entire house versus in an isolated area, soil boilings could have been "performed for the purpose of determining — getting some knowledge, some clues as to what is under the ground." Mr. Dailey further explained, however, that in the Defendants' situation,

> they hired a structural engineer to come and look at it, a well qualified structural engineer. That structural engineer came out and assessed the problem. His recommendation did not include to my knowledge asking for soil boilings to be done.
>
> Based on the evidence and time line I agree with what that engineer did. The house was already a year, year and a half old. If there are going to be major problems throughout a larger area, . . . – it is reasonable for him to conclude that they would have occurred and you would have at least seen starting signs of them at that time.
>
> That's not what he saw. He saw problems only existing in one area so he based his repair – the nature of the problem was small enough that a localized repair was appropriate, still was relatively expensive, but it was a localized repair.

Based solely on his review of Exhibit 16, the drawing prepared by Hanson Engineering to solve the problems encountered by the Plaintiffs in 2004 and 2005, Mr. Dailey testified that "[i]t is obvious from the extent – this is a major repair to raise an entire house. So, speculating, it seems that Mr. Hanson did have thoughts there were widespread problems."

> Mr. Dailey, however, further testified that
>
> Going back to . . . Sheppard's investigation at the time – and against a full at least 18 months had . . . gone by with the home being occupied prior to Sheppard arriving.
>
> I believe it would have been reasonable to conclude that at that point if there were poor soils under other areas of the footings, that there would have been other areas exhibiting the nature of the problems that were seen in the south. With that much time elapsing and you come and see just localized damage, I believe it was a reasonable conclusion that the – to have assumed that the problem areas were limited to that area and it would[ not] have taken the excavation by [Mr.] Showler to come to that conclusion.

> The facts of . . . what was occurring already were demonstrated, there's a problem with the soil under the footings. The excavation to find marrow is . . . just to find the particular nature of the problem. But there was obviously a problem with the soils under the footings in that area. And again based on the time line the – average engineer would not have ordered up a — full blown soils investigation . . . based on the physical evidence at that time.

<u>Applicable Law</u>

Subject to certain exceptions, Section 1328(a) of the Bankruptcy Code provides that a Chapter 13 debtor may obtain a general discharge from all debts provided for by the plan once the debtor completes all payments under the plan. 11 U.S.C. § 1328(a). One of the exceptions to Section 1328(a) involves certain debts that fall under 11 U.S.C. § 523(a). "[T]he standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary prepondereance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Rembert v. AT&T Universal Card Services, Inc.* (*In re Rembert*), 141 F.3d 277, 281 (6th Cir. 1998). "In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence. Further, exceptions to discharge are to be strictly construed against the creditor." *Rembert*, 141 F.3d at 281 (citing in part *Grogan*, 498 U.S. at 291) (other citation omitted).

In this adversary proceeding, the Plaintiffs seek a determination that their debt is excepted from the Debtors' general discharge under Section 523(a)(2)(A) based on actual fraud. If established, Section 523(a)(2)(A), read in conjunction with Section 1328(a), excepts from a discharge awarded under Chapter 13, any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
>
> > (A) . . . actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

The elements to be proven under actual fraud are a course of conduct intended to deceive, justifiable reliance, and proximate cause. *See Fields v. Mans*, 516 U.S. 59, 69 (1995) ("The operative terms in § 523(a)(2)(A), . . . 'false pretenses, a false representation, or actual fraud' carry the acquired meaning of terms of art. They are common-law terms, and . . . in the case of 'actual fraud,' which concerns us here, they imply elements that the common law has defined them to include.") (citations omitted)).

The term "actual fraud" as used in Section 523(a)(2)(A) "involves moral turpitude or intentional wrong, as opposed to fraud "implied in law," which may be found in cases where such intentional wrongdoing is not present. *Coman v. Phillips* (*In re Phillips*), 804 F.2d 930, 932 (6th Cir. 1986). "Actual fraud has been defined as intentional fraud, consisting in deception in intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud." *In re Vitanovich*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (other citations omitted). In *Vitanovich*, the Bankruptcy Appellate Panel for the Sixth Circuit adopted the reasoning engaged in by the Seventh Circuit Court of Appeals in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), which involved an analysis of the term "actual fraud" used in Section 523(a)(2)(A). *Vitanovich*, 259 B.R. at 876-77.

In *McClellan*, the Seventh Circuit Court of Appeals pointed out that a distinction exists between the three terms – false pretenses, false representation, and actual fraud used in Section 523(a)(2)(A). The *McClellan* Court held that actual fraud was not limited to those circumstances involving a debtor's misrepresentation or omissions. *Vitanovich*, 259 B.R. at 877. Instead, the *McClellan* Court broadly defined the term actual fraud to "encompass[] 'any deceit,

artifice, trick, or design involving direct or active operation of the mind, used to circumvent and cheat another." *Id*. (quoting 4 Lawrence P. King, *Collier on Bankruptcy* ¶ 523.08[1][e] at 523-45 (15th ed. rev. 2000)). To prove actual fraud, it must be established that a "debtor intended to deceive the creditor." Since "a debtor is unlikely to actually admit to acting with the intent to deceive, this requirement may be inferred from the debtor's conduct and from other surrounding circumstances." *In re Monfort*, 276 B.R. 793, 796 (Bankr. N.D. Ohio 2001) (citing *Araps v. DeBaggis* (*In re DeBaggis*), 247 B.R. 383, 391 (Bankr. D.N.J. 1999). "Essentially, the object is to, 'consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." *Bernard Lumber Co.*, *v. Patrick* (*In re Patrick*), 265 B.R. 913, 916-17 (Bankr. N.D. Ohio 2001).

Another element a plaintiff must establish under Section 523(a)(2)(A) is justifiable reliance in order to prove a non-dischargeable debt based on actual fraud. *Fields*, 516 U.S. at 74-75. Justifiable reliance means that a plaintiff "is required to make an investigation of his own" "where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived . . . ." *Id*. at 71. "[T]his does not mean that his conduct must conform to the standard of a reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id* at 70-71. (internal quotation marks and citation omitted).

The final element under the actual fraud exception in Section 523(a)(2)(A) required to be established is proof that a plaintiff's reliance "was the proximate cause of [its] loss[es]." *Rembert*, 141 F.3d at 280-81. Proximate cause "may be established by showing the conduct was

14

a substantial factor in the loss or the loss may be reasonably expected to follow." *FSB v. McClintic* (*In re McClintic*), 383 B.R. 689, 694 (Bankr. S.D. Ohio 2008).

Michigan's Seller Disclosure Act

A large part of the Plaintiffs' case is premised on statements or omissions in the Defendants' disclosure statement and invokes Michigan's Seller Disclosure Act ("SDA"). *See* Mich. Comp. Laws § 565.951 to § 565.966. Under Michigan's common law, the general rule of *caveat emptor* prevailed with respect to real estate transactions. *Christy v. Prestige Builders, Inc.*, 415 Mich. 684, 695 n.7, 329 N.W.2d 748, 752-53 (1982). Under *caveat emptor*, no general duty to disclose existed. *Id*. The SDA modified this common law rule by imposing a duty to disclose specific information. *See* Mich. Comp. Laws § 565.954(1) and § 565.957.

Mich. Comp. Laws § 565.954(1) provides, in pertinent part, that, "[t]he transferor of any real property described in [M.C.L.A. § 565.952] shall deliver to the transferor's agent or to the prospective transferee or the transferee's agent the written statement required by this act."

Mich. Comp. Laws § 565.957(1) provides the actual disclosure form required under the Act. *See Bergen v. Baker*, 264 Mich. App. 376, 385, 691 N.W.2d 770, 776 (2004) (explaining that "[t]he statutory from requires and provides, in part, that the seller answer all questions and report known conditions affecting the property"). For the purpose of the statement, the form reads: "This statement is a disclosure of the condition of the property in compliance with the seller disclosure act. This statement is a disclosure of the condition and information concerning the property, known by the seller." Mich. Comp. Laws § 565.957(1). The statutory form further provides that "unless otherwise advised, the seller has not conducted any inspection of generally inaccessible areas such as the foundation or roof. This statement is not a warranty of any kind by the seller or by any agent representing the seller in this transaction, and is not a substitute for

15

any inspections or warranties the buyer may wish to obtain." *Id*. The statutory form also provides that, "the seller specifically makes the following representations based on the seller's knowledge at the signing of this document." *Id*.

In addition, under the statutory form, the seller is instructed to: "(1) Answer ALL questions. (2) Report known conditions affecting the property. (3) Attach additional pages with your signature if additional space is required. . . ." Mich. Comp. Laws § 565.957(1).

Liability arising from errors, inaccuracies, or omissions in a seller's disclosure statement is controlled by Mich. Comp. Laws § 565.955(1), which provides:

> The transferor or his or her agent is not liable for any error, inaccuracy, or omission in any information delivered pursuant to this act if the error, inaccuracy, or omission was not within the personal knowledge of the transferor, or was based entirely on information provided by public agencies or provided by other persons specified in subsection (3), and ordinary care was exercised in transmitting the information. It is not a violation of this act if the transferor fails to disclose information that could only be obtained through inspection of observation of inaccessible portions of real estate or could be discovered only by a person with expertise in a science or trade beyond the knowledge of the transferor.

The Michigan Court of Appeals in *Roberts v. Saffell*, 280 Mich. App. 397, 406 n.2, 760 N.W.2d 715, 721 (2008), explained that "the SDA only imposes a duty on the transferor of real estate covered by the act to honestly disclose items about which the transferor actually knows." The appellate panel further determined that "nothing in the plain terms of the SDA . . . requires a transferor of property covered by the act to exercise ordinary care to discover defects in the property being transferred." *Id*. at 408, 722.

The disclosures required by the SDA "shall be made in good faith." Mich. Comp. Laws § 565.960. "'[G]ood faith means honesty in fact in the conduct of the transaction." Mich. Comp. Laws § 565.960.

Michigan case law recognizes that if fraudulent disclosures exist in a seller's disclosure

statement, the requirements of the SDA may be enforced through common law causes of action grounded in fraud. *See Bergen v. Baker*, 264 Mich. App. 376, 385, 691 N.W.2d 770, 776 (2004) (explaining that, "it is evident that the Legislature intended to allow for seller liability in a civil action alleging fraud or violation of the act brought by a purchaser on the basis of misrepresentations or omissions in the disclosure statement, but with some limitations").

Analysis

The Plaintiffs' Section 523(a)(2)(A) claim is premised on actual fraud perpetrated by the Defendants against the Plaintiffs because of alleged false representations and omissions contained in their seller's disclosure statement. The Plaintiffs contend that the alleged false representations and non-disclosures (i.e., omissions) made by the Defendants in the seller's disclosure statement prevented them from complying with their statutory disclosure requirements under Michigan's Seller's Disclosure Act.

First, the Plaintiffs contend that the Defendants falsely represented in their seller's disclosure statement the extent of the original repairs and the corrective measures taken to address the structural problems with the basement at the Property.

Next, the Plaintiffs argue that the Defendants failed to disclose a 2001 state court lawsuit commenced by them and against various defendants that involved the Property. The Plaintiffs alleged that during the Defendants' state court lawsuit, their experts discovered the existence of additional structural problems and deficiencies in the basement foundation at the Property. The Plaintiffs further allege that despite the Defendants' knowledge of this information, it was not disclosed by them in their seller's disclosure statement. The Plaintiffs specifically point out that the Defendants failed to disclose a proposal made by AnchorTech during their state court lawsuit, which provided for the installation of 31 helical piers and an interior basement drain

system to address excess water.

The Court concludes that no evidence exists about the Defendants' knowledge of the conditions of the basement or foundation in 2002 at the time they completed seller's disclosure statement. Both Defendants testified that once they fixed the settling problem in 2000, they did not experience any additional problems with their home and were unaware of any problems with the basement. Similarly, no evidence shows that during the pendency of the state court lawsuit that an investigation of the Property occurred and conclusions were reached by any engineers about additional structural problems or existing deficiencies in the basement walls at the Property. The Plaintiffs assert that certain paragraphs in the first amended complaint regarding the Defendants' request for future damages establish that the Defendants had knowledge of the basement wall problems and should have disclosed this information to the Plaintiffs. In addition, the Plaintiffs assert that the Defendants were required to disclose the pending litigation to the Plaintiffs because the scope of the litigation involved the Property.

The Court finds that the future damages paragraphs contained in the first amended complaint filed in the state court lawsuit are insufficient to prove the Defendant's knowledge of any existing or likely problems with the basement. Beyond the submission of the first amended complaint as an exhibit and the Defendants' admission that they did not disclose the pending lawsuit in their seller's disclosure statement, no other testimony was introduced to corroborate or substantiate the Plaintiffs' legal theory. To the contrary, the existing evidence in the record tends to disprove the Plaintiffs' theory.

With regard to the Plaintiffs' argument that under the SDA, the Defendants were required to disclose the pending litigation in their disclosure statement, the Court disagrees. Mr. Woods

testified that the state court lawsuit was against individuals that assisted in the construction of the home in 1998. He further testified that he hoped to recover the costs he incurred to repair the settling problem near the front porch area of the basement, which occurred in 2000. This lawsuit did not involve a continuing condition of the Property that was known by the Defendants. In addition, no evidence exists to show that under the SDA a seller is required to disclose general information about the property being sold that is not related to a condition of the property.

Under Michigan law, because the Plaintiffs did not prove that the Defendants engaged in fraud, the "as is" clause in the parties' purchase agreement transferred the risk of loss for defects that should have been reasonably discovered to the Plaintiffs. *Lorenzo v. Noel*, 206 Mich. App. 682, 687, 522 N.W.2d 724, 726 (1994) (explaining that, "[a]s is" clauses allocate the risk of loss arising from conditions unknown to the parties . . . [and] . . . also transfer the risk of loss where the defect should have reasonably been discovered upon inspection, but was not") (alteration and other citations omitted).

Conclusion

After reviewing and weighing all of the evidence, the Court is not persuaded that the evidence in this record proves that the Defendants defrauded the Plaintiffs. The Court holds that the Plaintiffs did not meet their burden to prove that their alleged debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code.

The Court directs counsel for the Defendants to prepare and submit an appropriate Order.

**Signed on March 31, 2011**

                                          **/s/ Daniel S. Opperman**
                                **Daniel S. Opperman**
                                **United States Bankruptcy Judge**